UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MacKELLAR ASSOCIATES, INC.,

    Plaintiff,

Case No. 07-12468

Honorable Nancy G. Edmunds

v.

SERIGRAPH, INC.,

    Defendant.
                               /

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [35]**

This is a dispute over sales commissions. Plaintiff MacKellar Associates, Inc. (MacKellar)'s complaint alleges that Defendant Serigraph, Inc. (Serigraph) breached its July 1982 Sales Representative Agreement and violated Wisconsin's Sales Commission Act.[1] MacKellar seeks pre-termination commissions along with penalty damages under the Wisconsin Sales Commission Act. This matter is before the Court on Serigraph's motion for summary judgment. Serigraph contends that MacKellar's claims are barred by the doctrines of waiver and estoppel. Serigraph's motion for summary judgment is DENIED. Genuine issues of material fact exist on the questions whether (1) MacKellar voluntarily and intentionally waived its contractual rights under the 1982 Agreement, and (2) Serigraph reasonably relied on MacKellar's conduct to its detriment.

---

[1] The 1982 Agreement provides that it "shall be governed by, and construed in accordance with the laws of the State of Wisconsin," and neither party challenges the application of Wisconsin law. (Pl.'s Resp., Ex. 1, 7/1/82 Sales Representative Agreement at III.D.)

**I.     Facts**

**A.  Contractual Relationship with Defendant's Predecessor Corporation**

Plaintiff MacKellar is a fourth generation, family-owned, sales representative firm in the automotive, appliance, and electronics industries.  Defendant Serigraph is a manufacturer of highly-engineered, custom, screen-printed appliques for use in products like automotive instrument panels and automotive heater/air conditioner control panels.

In July 1982, MacKellar entered into a written Sales Representative Agreement ("1982 Agreement") with Defendant Serigraph's predecessor, Serigraph Sales & Mfg. Co., Inc., a Wisconsin corporation.  Under that Agreement, MacKellar was entitled to sales commissions of 10% of the gross sales price on all sales made to customers in its designated territory, even if sales were made directly by Serigraph, unless the parties agreed in writing to a different commission rate.  It also provided that, if terminated, MacKellar would be entitled to commissions on all orders invoiced and shipped within 30 days after notice of termination.

Relevant provisions of that 1982 Agreement provide that:

(1)  MacKellar was entitled to "a commission equal to ten percent (10%) of the gross sales price" on orders in its territory "unless another rate [was] mutually agreed upon for specific orders due to competitive situations" (1982 Agreement, ¶ I.D, Compensation);

(2)  MacKellar was to "receive a statement reflecting the amount of commission earned as well as the job descriptions and work completed upon which commission [was] based . . . . at the time of payment of commission" (1982 Agreement, ¶ I.E, Earned Commission);

2

(3) MacKellar agreed that, under certain circumstances, Serigraph Sales & Mfg. had the right to "off-set" it's commissions (1982 Agreement, ¶ I.F, Commissions - Right of Off-Set);

(4) Serigraph was required to promptly notify MacKellar of any action it took with regard to "any inquiries for business from any potential or present customer" within MacKellar's "primary territory." Serigraph Sales & Mfg. was free to accept any business directly, but MacKellar was "entitled to commission on the business received" (1982 Agreement, ¶ II.B, Handling of Inquiries);

(5) Serigraph was "solely responsible for and [bore] all expenses of supplying or producing, assembling, packaging, shipping and, wherever required, installing the products" (1982 Agreement, ¶ II.I, Expenses of Production);

(6) the Agreement was to remain in effect until either party provided the other with written notice of termination to take 30 days from the date of notice (1982 Agreement, ¶ III.A, Term);

(7) "waiver by either party of a breach of any term" could not "operate or be construed as a waiver of any subsequent breach" of the Agreement (1982 Agreement, ¶ III.B, Waiver of Breach);

(8) the Agreement was "the full and complete understanding and agreement of the parties . . . and [could not] be amended, changed, or modified or terminated without the consent, in writing," of MacKellar and Serigraph (1982 Agreement, ¶ III.E, Complete Agreement and ¶ III.H, Amendments); and

(9) the Agreement contained a provision for splitting commissions between sales agents with different Serigraph territories; not between a sales agent and Serigraph:

> For [Serigraph] customer's parts which are design engineered on a one time or continuing basis in one Agent's territory but purchased by and shipped to a customer or a contractor in another Agent's territory, the two Agents involved shall share in the 10% commission paid on billings by the Company for the life of the part number and as long as the Agent is an Agent under this Agreement. The respective shares of the 10% commission shall be determined by negotiation between such Agents. Should the Agents fail to come to an agreement, then [Serigraph] shall determine the respective shares after considering all pertinent facts. Each Agent shall be responsible for servicing the customers within his territory. [Serigraph] shall have the right to withhold payment until a determination can be made and such holdback shall not be considered a default by [Serigraph]. [Serigraph] shall make the determination if the Agents have failed to do so within sixty (60) days of the date the earned commission is payable. [Serigraph]'s decision shall be binding on the Agent.
>
> When a [Serigraph] customer relocates from one Agent's territory to another Agent's territory, [Serigraph] will investigate the circumstances surrounding the relocation and issue guidelines concerning the payment of commissions based on the facts in each case. [Serigraph]'s decision shall be binding on the Agent.

(1982 Agreement, ¶ III.G, Mutual Territory). Schedule A to the Agreement identified MacKellar's sales territory and accounts as: "State of Michigan - Except Tecumseh Engines, Tecumseh, Michigan (Carrier Air Conditioning Part Only) (Whirlpool)." (Pl.'s Ex. 1.)

The 1982 Agreement was modified, effective July 1, 1985, by a signed written Amendment. The Amendment provided a graduated commission scale on annual gross sales per account. Commissions decreased gradually from 10% for annual gross sales per account up to $1 million down to 7% for annual gross sales per account of over $4 million. (Pl.'s Resp., Ex. 5, 1985 Amendment.)

On March 11, 1987, Schedule A to the 1982 Sales Representative Agreement was revised "reflecting the addition of Inland-Division of General Motors in Dayton and Midland-Ross Corp. in Urbana, OH" to MacKellar's accounts. (Pl.'s Resp., Ex. 6.)

4

**B. 1987 Acquisition of Predecessor Corporation and Continuing Business Relationship with Successor Corporation, Defendant Serigraph**

In June or July 1987, all of the stock of the Wisconsin corporation, Serigraph Sales & Mfg. Co., Inc., was acquired by another Delaware corporation, SSM Acquisition Corp., which later changed its name to Serigraph, Inc., the Defendant in this lawsuit. MacKellar was unaware of the nature or details of this business transaction. MacKellar only knew that there was a new corporation with new owners. No one from the newly formed corporation told MacKellar that the new corporation had assumed the obligations owed it under the 1982 Agreement.

Absent knowledge of facts to the contrary, MacKellar believed that his written 1982 Agreement with the predecessor company was no longer in effect. MacKellar continued to operate as a sales representative for the new corporation, Serigraph, Inc., under the assumption that an oral agreement had replaced the written 1982 Agreement. Under that oral agreement, MacKellar believed that it would be entitled to life-of-the-part sales commissions in the event of a termination. (Pl.'s Resp., Ex. 7, S. MacKellar" Aff. at ¶¶ 4-7; Ex. 2, Stock Purchase Agree. at 1; Exs. 3 and 4, Wis. Dept. of Fin. Inst. documents.)

During 1995 and 1996, MacKellar and Serigraph attempted to negotiate a new written Manufacturer's Representative Agreement. (Pl.'s Resp., Exs. 8 and 9.) During these negotiations, representatives of Serigraph told MacKellar's President that the 1982 Agreement was no longer in effect. (Pl.'s Ex. 10, Stephen MacKellar" Dep. at 59-64.) The new agreement proposed by Serigraph was never agreed to or signed by the parties.

In September 1995, Serigraph and MacKellar formally amended Schedule A, to include changes to MacKellar's sales territory and accounts. (Pl.'s Resp., Ex. 11, Schedule

A.) Additions to MacKellar's territory included Western Europe, the VDO account (later known as Siemens VDO and then Continental), and the C Plastics account with a notation "(Split with Landfear & Brophy)." (*Id.*)

On June 30, 2005, MacKellar and Serigraph executed another written amendment to their sales representative agreement. (Pl.'s Resp., Ex. 18.) The new "Schedule B Commission Schedule - OEM" set out Serigraph's new commission schedule and commission split policy that was to take effect on July 1, 2005. It provided that sales representatives were entitled to a commission of the "Net Sales Price," defined as "the gross revenue received by Serigraph as a result of Sale, less dies, tooling, samples, art and preparation charges, discounts, rebates, taxes, duties and shipping charges." (*Id.*) Commission rates were reduced and to be paid in accordance with the new commission split policy. In addition, commissions on outsourced products and services were, as of July 1, 2005, to be paid at the rate of 20% of the markup.

Before the effective date of this 2005 amendment, there was no written agreement permitting Serigraph to pay commissions on anything less than the full gross sales price or permitting it to otherwise reduce agreed-upon commissions. MacKellar presents evidence that it repeatedly and consistently objected when Serigraph unilaterally made changes that significantly reduced its commissions. (Pl.'s Ex. 10, MacKellar Dep. at 79-81, 86-92, 106-07; Ex. 13, Ignatowski Dep. at 10-14, 17; Ex. 7, MacKellar" Aff. at ¶¶ 8-11; Ex. 14, Ignatowski Aff. at ¶¶ 5-6; Ex. 16, 11/03 email confirming discussions about MacKellar's objections to commission reductions; Ex. 21, 8/23/06 email confirming MacKellar objected to Serigraph commission split policy and Serigraph's proposal to remedy objections; Ex. 22, 10/13/06 meeting notes and Ex. 23, 11/16/06 committee notes confirming that

MacKellar had informed Serigraph that the commissions paid on its Visteon and C Plastics accounts were contrary to their agreement.)

Although Serigraph provided monthly commission statements, MacKellar contends that it was not possible to verify the commission calculations. The commission statements generally consisted of an Excel spreadsheet with thousands of entries and no supporting documentation. MacKellar asserts that Serigraph (1) arbitrarily adjusted commission rates without any explanation, (2) arbitrarily subtracted "Material Adjustments" without explanation or supporting documentation, and (3) failed to report any sales at all on certain programs sold to accounts in MacKellar's territory when it felt commissions were not owed. In support, MacKellar presents evidence that Serigraph failed to report approximately $60 million of sales to MacKellar's Siemens VDO Germany Account. (*Compare* Pl.'s Exs. 11 and 31.) Serigraph's Accounting Manager, Debra Diehl, who was responsible for calculating MacKellar's commissions, acknowledged during her deposition that there was no way that MacKellar could ever verify the accuracy of its commission payments based on reports provided by Serigraph. (Pl.'s Ex. 19, Diehl Dep. at 39; Ex. 20, sample commission report.)

**C.  2007 Serigraph Terminates MacKellar as Sales Representative**

In March 2007, the parties were still having significant discussions about MacKellar's dissatisfaction with the way commissions were being calculated. This was the topic at a meeting attended by Serigraph's Senior Vice President of Sales & Marketing, Randal Wiskirchen, and MacKellar's President and Vice President of Sales & Marketing, Steve MacKellar and Jeff Ignatowski, respectively. (Pl.'s Resp., Ex. 24, 3/7/07 email regarding discussions.) The commission shortage on MacKellar's Visteon account was addressed

7

at length by the parties. Serigraph identified approximately $120,000 of underpaid commissions and contended that it had overpaid MacKellar by approximately $50,000 on its Key Plastics account. Serigraph offered to settle both commission disputes for $70,656 in exchange for MacKellar's full release of all claims for overdue commissions. On May 2, 2007, Serigraph's Vice President of Automotive Operations, John Grasse, sent an email to Steve MacKellar with this proposed resolution. (Pl.'s Resp., Ex. 26.)[2]

On May 3, 2007, Steve MacKellar responded that Serigraph's request for a full release was "over reaching," that it had agreed to a far narrower release about specific disputed commissions, and complained that it had not received any data supporting Serigraph's calculations. (Pl.'s Resp., Ex. 27; Ex. 28, Grasse Dep. at 150.)

Unbeknownst to MacKellar, at the time of the April/May 2007 disputed commission negotiations, Serigraph had already decided to terminate MacKellar's sales representative agreement. (Pl.'s Resp., Ex. 28, Grasse Dep. at 161.)

On June 4, 2007, Serigraph sent MacKellar a 30 day notice-of-termination letter, pursuant to the terms of the 1982 Sales Representative Agreement, informing it that the parties' Sales Representative Agreement would be terminated effective July 6, 2007, and that Serigraph would pay commissions on qualified sales up to the date of termination as required by their Agreement. (Pl.'s Resp., Ex. 29.)

---

[2]Around this time, Serigraph's Accounting Supervisor, Debra Diehl, had prepared a 42-page spreadsheet detailing commission underpayments by Serigraph on MacKellar's Visteon account. (Pl.'s Resp., Ex. 25.) Ms. Diehl testified that she did not verify the information that went into the spreadsheet, and she was uncertain whether all of the numbers were accurate. (Pl.'s Resp., Ex. 19, Diehl Dep. at 63-64.)

8

**D. MacKellar Lawsuit**

On June 8, 2007, MacKellar filed this lawsuit against Serigraph. Because MacKellar thought an oral agreement governed its business relationship with Serigraph, it originally filed this lawsuit asserting a claim for post-termination commissions under the Procuring Cause Doctrine. It alleged that MacKellar had procured orders prior to the termination which were expected to result in $40 to $50 million in annual sales for at least four to five years.

After discovery revealed that it was most likely that the 1982 Agreement remained in effect, MacKellar conducted an audit of commissions it received during the last six years of the parties' relationship. It subsequently filed an Amended Complaint seeking pre-termination commissions along with penalty damages under the Wisconsin Sales Commission Act. (Pl.'s Resp. at 3.)

This matter is now before the Court on Defendant Serigraph's motion for summary judgment arguing that the claims asserted in MacKellar's Amended Complaint are barred by the doctrines of estoppel and waiver.

**II. Summary Judgment Standard**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an

element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III.   Analysis

Serigraph's motion for summary judgment does not address the merits of MacKellar's claims that it breached the parties' Sales Representative Agreement and violated Wisconsin's Sales Commission Act. Rather, it contends that the affirmative defenses of waiver and equitable estoppel bar MacKellar's claims. Serigraph argues that these doctrines are properly invoked here because MacKellar (1) received and cashed Serigraph's commission checks throughout the six-year limitations period at issue here (2001-2007), (2) continued to perform by servicing its accounts despite repeatedly raising complaints about the accuracy of commissions paid on those accounts, (3) failed to threatened termination unless all claimed commissions were paid, and (4) by its conduct, induced Serigraph into reasonably relying to its detriment in believing that MacKellar would not sue for any unpaid commissions upon termination of their contractual relationship.

MacKellar responds that Serigraph's motion should be denied because genuine issues of material fact on Serigraph's waiver and estoppel defenses preclude summary judgment. This Court agrees that Serigraph's motion should be denied.

Serigraph raises the same arguments and presents the same evidence in support of its contention that the doctrines of waiver and equitable estoppel bar MacKellar's claims. As observed by the Wisconsin Supreme Court, "[w]hile the words 'waiver' and 'estoppel' are often used interchangeably, they represent distinct but related doctrines." *Milas v. Labor Assoc. of Wis., Inc.*, 571 N.W.2d 656, 659 (Wis. S. Ct. 1997). Because they are distinct doctrines, each is addressed separately, beginning with waiver.

**A. Waiver**

It is well established that "Wisconsin courts recognize the doctrine of waiver in contract cases." *Empire Screen Printing, Inc. v. Park Bank*, No. 96-3506, 1998 WL 54661 (Wis. Ct. App. Feb. 12, 1998). The Wisconsin Supreme Court has "defined waiver as the voluntary and intentional relinquishment of a known right and has stated that intent to relinquish the right is an essential element of waiver." *Milas*, 571 N.W.2d at 659 (internal quotation marks and citation omitted). The focus of the waiver doctrine in this case would be on MacKellar's intent, and the "intent to waive may be inferred" from its conduct. *Id.*

To establish waiver, Serigraph must show that MacKellar had, at the time of waiver, either constructive or actual knowledge "of the existence of [its] rights or facts upon which they depended." *Mulvaney v. Tri State Truck & Auto Body, Inc.*, 235 N.W.2d 460, 465 (Wis. S. Ct. 1975). "Ignorance of a material fact or consent given under a mistake of fact [negates] waiver." *Id.*

Summary judgment for Serigraph on the defense of waiver would be inappropriate in light of MacKellar's evidence that (1) it repeatedly challenged the accuracy of Serigraph's commission payments on its accounts, (2) it lacked knowledge of material facts about the 1987 acquisition of Serigraph Sales & Mfg. Co. and whether the successor corporation had

11

assumed obligations owed it under that Agreement, and (3) Serigraph employees made representations to MacKellar in 1995 and 1996 that the 1982 Agreement was no longer in effect. Genuine issues of material fact exist whether MacKellar voluntarily and intentionally waived any contractual rights it knew or should have known existed under its 1982 Agreement with Serigraph.

### B. Equitable Estoppel

As observed by the Wisconsin Supreme Court, this doctrine "focuses on the conduct of the parties." *Milas*, 571 N.W.2d at 660. "The party asserting equitable estoppel as a defense must prove the elements of estoppel by clear, satisfactory and convincing evidence." *Id.* at 660, n.14.

Thus, to establish its estoppel defense, Serigraph must prove by clear, satisfactory and convincing evidence that:

(1) action or non-action,

(2) by MacKellar,

(3) induced Serigraph's reasonable reliance, and

(4) caused it to change its position to its detriment.

*Id.* at 660, 661.

In light of MacKellar's evidence that it repeatedly complained to Serigraph about its failure to pay agreed-upon commissions, summary judgment for Serigraph on the defense of equitable estoppel would be inappropriate. Genuine issues of material fact exist whether it was reasonable for Serigraph to ignore these complaints and to rely to its detriment on the assumption that MacKellar would not sue for unpaid commissions after being terminated.

12

The decisions Serigraph relies upon to support its waiver and estoppel defenses are distinguishable for various reasons. First, none apply Wisconsin law and thus are not binding precedent. Several are unpublished. *See, e.g., Vandevier v. Mulay Plastics, Inc.*, 482 N.E.2d 377 (Ill. Ct. App. 1985) (applying Illinois law); *Siegel v. Samsung Elec. Am., Inc.*, No. 85 C 9193, 1987 WL 8193 (N. D. Ill. Mar. 13, 1987) (same); *Bottini v. Lewis & Judge Co.,* 621 N.Y.S.2d 753 (N.Y. App. Div. 1995) (applying New York law); *B. R. Woodward Mktg., Inc. v. Collins Food Serv., Inc.*, 754 P.2d 99 (Utah Ct. App. 1988) (applying Utah law); *Century Sales, Inc. v. Jupiter Aluminum, Inc.*, No. 4:02-CV-0607-A, 2002 WL 31875610 (N.D. Tex. Dec. 20, 2002) (applying Texas law); *Utility Prods. Co, v. USCO Power Equip. Corp.*, No. 3-06-CV-1948-M, 2007 WL 4440946 (N.D. Tex. Dec. 18, 2007) (same); and *Arbogast v. Bryan*, 393 So.2d 606 (Fla. Ct. App. 1981) (applying Florida law).

Second, unlike this case, those decisions do not address circumstances where there is a written contract that expressly provides that (1) "waiver by either party of a breach of any term" cannot "operate or be construed as a waiver of any subsequent breach" and (2) the contract cannot be "amended, changed, or modified or terminated without the consent, in writing," of the contracting parties. (1982 Agreement, ¶ III.B, Waiver of Breach; ¶ III.E, Complete Agreement; ¶ III.H, Amendments.) For example, in *Vandevier*, there was an oral contract, and the issue before the trial court was whether the parties' conduct showed that there was a meeting of the minds on the commission term of that oral contract. The court determined that there was, and it favored the employer's position. The plaintiff was thus unable to establish a breach of contract. *Vandevier*, 482 N.E.2d at 380-81. Moreover, unlike the contract at issue here, in *Bottini*, the plaintiff had an at-will employment contract

13

that allowed the defendant employer to freely "modify the terms of the plaintiff's employment if he found the new terms unacceptable." *Bottini*, 621 N.Y.S.2d at 754 (citations omitted).

The remaining decisions are likewise distinguishable from the facts presented in this matter. Unlike MacKellar, the plaintiffs in these decisions failed to raise any objections to their commissions before being terminated. *See, e.g., Siegel*, 1987 WL 8193 at *3 (observing that the plaintiff failed to object to commissions before being terminated and thus waived his breach of contract claims); *B.R. Woodward Mktg., Inc.*, 754 P.2d at 103 (same); *Century Sales, Inc.*, 2002 WL 31875610 at *3 (same); *Utility Prods. Co.*, 2007 WL 4440946 at *3 (same); and *Arbogast*, 393 So.2d at 608-09 (same).

## IV.  Conclusion

For the above stated reasons, Defendant Serigraph's motion for summary judgment is DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 9, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 9, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

14